IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEVIN LAMONT KELLY** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **EDWARD J. KLEM, THE DISTRICT** | : | |
| **ATTORNEY OF THE COUNTY OF** | : | |
| **DELAWARE, and THE ATTORNEY** | : | |
| **GENERAL OF THE STATE OF** | : | |
| **PENNSYLVANIA** | : | **NO. 05-3843** |

<u>**MEMORANDUM & ORDER**</u>

**NORMA L. SHAPIRO, S.J.**                                                                 **AUGUST 21, 2008**

Petitioner, Kevin Lamont Kelly ("Kelly"), a prisoner at the Frackville State Correctional Institution, filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. §2254. Kelly's petition alleged five claims: (1) ineffective assistance of trial counsel for failing to call two alibi witnesses, Ernest Carter and Williamina Kelly[1]; (2) imposition of an unlawful sentence; (3) ineffective assistance of trial counsel for failing to challenge the introduction into evidence of an allegedly improper photo array; (4) ineffective assistance of trial counsel for failing to call alibi witness James "Ratboy" Fowlkes; and (5) ineffective assistance of trial counsel for failing to investigate or call witness Williamina Kelly, who may have provided exculpatory testimony. The court approved Magistrate Judge Peter B. Scuderi's Report and Recommendation that claims 1, 3 and 5 were without merit. With respect to claims 2 and 4, the court ordered counsel appointed and the petition remanded for an evidentiary hearing to determine: (1) the factual basis underlying Claims 2 and 4; and (2) whether Kelly makes a sufficient showing of actual innocence so claims 2 and 4 may be considered on the merits although they are procedurally defaulted. After

---

[1] "Kelly" refers to the petitioner. Williamina Kelly will always be designated by her first and last name.

an evidentiary hearing, Magistrate Judge Scuderi filed a Supplemental Report and Recommendation ("Supplemental R&R") that Kelly had not made a sufficient showing of actual innocence allowing him to argue the merits of claims 2 and 4. Kelly filed objections. For the following reasons, the court will approve and adopt the Supplemental R&R. Claims 2 and 4 of Kelly's habeas petition will be denied as procedurally defaulted, and the objections will be overruled.

I.      BACKGROUND AND PROCEDURAL HISTORY

The procedural history is described at length in Magistrate Judge Scuderi's original R&R filed January 24, 2006, and in this court's memorandum and order dated October 6, 2006; the court recites only those facts relevant to deciding Kelly's gateway claim of actual innocence. In considering a petition for a writ of habeas corpus under 28 U.S.C. § 2254, the court presumes state court factual determinations to be correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Kelly was charged with murder in the first degree, robbery, and related offenses for the shooting death of Sam London and the wounding of Robert Keatley. The trial court described the evidence at trial as follows:

> The evidence presented at trial established that Sam London and Robert Keatley were living together in an apartment in the City of Chester. On April 28, 1996, co-defendant[2] Clifford Harris came to the apartment and knocked on the door. Robert Keatley testified that when he asked the identity of the knocker he heard and recognized the voice of Clifford Harris. He had known Clifford Harris for some time and knew that he had visited the apartment on several prior occasions. Upon opening the door, Clifford Harris along with his co-defendants, Kevin Kelly and Tyrone Harris, rushed into the apartment. A struggle ensued between the intruders and the occupants resulting in Kevin Kelly producing a gun and firing it several

---

[2]The co-defendants' charges were severed prior to Kelly's trial.

times.  Sam London received a fatal gunshot to his head and Robert Keatley was wounded in his arm.  The surviving victim identified Kevin Kelly as the person who held the gun and fired the shots killing Sam London and wounding himself.

Prior to coming to the London and Keatley apartment, co-defendants Kevin Kelly, Clifford Harris and Tyrone Harris were together in the City of Chester.  They had been drinking and decided that they wanted to obtain some cocaine.  Prior to driving to the apartment, Tyrone Harris and Kevin Kelly were passing a revolver between them and Tyrone Harris put some shells in the gun.  The evidence established that Tyrone Harris and Kevin Kelly discussed in the presence of Clifford Harris that they were going to the London apartment in an effort to rob him.

The evidence presented by the Commonwealth at trial came from the testimony of Robert Keatley and Kevin Kelly's co-defendants, Tyrone Harris and Clifford Harris.  Trial counsel for the defendant attempted to establish that the testimony of both of the Harrises was biased and they identified Kevin Kelly as the shooter in order to obtain more lenient sentences for themselves.  Counsel also attempted to impeach these witnesses through inconsistencies between their statements to the police and their trial testimony.  Counsel for the defendant presented a single defense witness, the detective of the Delaware County Criminal Investigation division who conducted a lineup at the Delaware County Prison.  At this lineup Robert Keatley failed to identify Kevin Kelly and picked out someone other than Kevin Kelly as the shooter.  Trial counsel called no other witnesses on behalf of the defendant.

Commonwealth of Pennsylvania v. Kelly, No. 95-5187, slip op. at 2-3 (Pa. C.C.P. Del.Co., June 30, 1998).  Robert Keatley testified that Kelly and the Harrises arrived at London's apartment at approximately 1:45 a.m.  See Br. For Appellee, 1999 WL 33840662 at *3 (Pa. Super.Ct., Jan. 8, 1999) (citing Notes of Testimony 8/6/97, pages 67-68).

On August 8, 1997, the jury convicted Kelly of second degree murder, robbery, and aggravated assault.  New counsel was appointed for sentencing.  Kelly was sentenced to life imprisonment for his second degree murder conviction with ten to twenty years consecutive for the aggravated assault conviction.  The robbery conviction merged for sentencing.  Kelly filed post-sentence motions, a direct appeal, and multiple petitions for collateral relief under

3

Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Con. Stat. § 9541, et seq..

Kelly's post-sentence motions alleged, in relevant part, ineffective assistance of counsel for failing to call Ernest Carter and Williamina Kelly at trial. In an interview prior to trial, Carter had described observing "the taller thin guy drove the car. The heavier older guy got in the front seat passenger and the third black skinny guy I didn't see before he got in the back seat of the Neon." Commonwealth of Pennsylvania v. Kelly, No. 95-5187, slip op. at 4 (Pa. C.C.P. Del.Co., June 30, 1998) (citing Notes of Testimony 2/6/98, pages 13 to 14). The Harrises had testified that Kelly was the driver of the Dodge Neon automobile used on the night of the murder, but Kelly is approximately 5'9" tall and weighs approximately 145 lbs. Id. at 3-4. Clifford and Tyrone Harris have a brother, a tall, thin black male who drove a Dodge Neon automobile. Id. at 4. Carter also stated he saw the same three black males and a white male in the alleyway behind the apartment where London was killed. Id. Tyrone Harris, Clifford Harris, and Robert Keatley never acknowledged meeting outside the apartment prior to the robbery and murder. Id.

As established at a February 6, 1998, post conviction hearing, Carter also recited in his statement that one of the black males involved in the incident was approximately 220 lbs., 5'8" to 5'11" tall and wearing a dark jogging suit. Id. at 5. The Commonwealth presented evidence that the police seized a blue jogging suit from the home of Kelly's girlfriend. Id.

Williamina Kelly testified at a hearing before the trial court on February 12, 1998. Id. at 7. She testified that on the night of the shooting, she witnessed Tyrone Harris, Clifford Harris and Kevin Kelly arrive in a Dodge Neon automobile near her apartment in the City of Chester; Kelly was the driver. Id. Tyrone Harris and Clifford Harris went to the apartment of Juanita Harris, the mother of Tyrone Harris. Id. Williamina Kelly learned at a later time that Tyrone Harris had

delivered a gun to Juanita Harris with instructions to dispose of the weapon. Id. Within twenty-four hours, Williamina Kelly saw Juanita Harris walking toward the Delaware River. Id.

On February 3, 1998, during the pendency of Kelly's post-sentence motions, Lennon Investigations interviewed James Fowlkes. The notes of the interview with Fowlkes are as follows:

> Subject was interviewed by telephone on February 3, 1998. He seemed to be of average intelligence and expressed himself adequately.
>
> He stated that on April 28, 1996, he was employed as a janitor at the Madison Grill, 12th and Madison Streets, Chester, Pennsylvania. On that date, he observed Kevin Kelly drinking in the Madison Grill all evening until 12:30 or 1:00 AM. At that time, Mr. Kelly departed the bar with a male who stopped by the bar and a female the witness identifies as Mr. Kelly's sister-in-law. The witness said that they took a ride. At approximately 1:30 to 1:45 AM, the witness observed Kevin Kelly return to the Madison Grill. At that time, the witness was in the second floor apartment where he lives above the bar. Mr. Kelly yelled up for the witness but the witness did not respond to his calls. Mr. Kelly was now in the company of his sister-in-law. Mr. Kelly departed the area in his vehicle, make and model unknown. Mr. Fowlkes believes the car was that of Mr. Kelly's girlfriend. Mr. Kelly left the Madison Grill at approximately 1:30 to 1:45 AM. He drove towards the Howard Johnson's which the witness says is in the direction of Mr. Kelly's house. The witness did not see Mr. Kelly again that evening. During this night, the witness did not observe any guns in the possession of Mr. Kelly.

(Pet'r's Response and Objection to R&R, Ex. 1(A).) Lennon's report was submitted to attorney Leach on February 17, 1998. (Pet'r's Response and Objection to R&R, Ex. 1(A) at 3.) The evidentiary hearings on Kelly's post-sentence motions had already been held on February 6 and 12, 1998, so the court could not have considered the significance of Fowlkes' testimony in deciding the post-sentence motions.

The trial court denied Kelly's post-sentence motions. It found, *inter alia*, that trial counsel was not ineffective for failing to call Ernest Carter and Williamina Kelly as

witnesses at trial.

Kelly, alleging, *inter alia*, ineffective assistance of counsel for failing to call Carter and Williamina Kelly as witnesses, filed a direct appeal. The Superior Court affirmed the judgment of sentence and the Pennsylvania Supreme Court denied allocatur.

Kelly, alleging ineffective assistance of counsel, filed a *pro se* PCRA petition. While appointment of counsel was pending, Kelly filed an amended *pro se* PCRA petition with similar claims, but added he had told trial counsel Fowlkes was a potential witness, and explained the relevance of Fowlkes' potential testimony as an alibi witness. PCRA counsel was appointed and filed a supplemental PCRA petition that included trial counsel's failure to locate and subpoena Fowlkes.

On February 4, 2002, while Kelly's amended PCRA petition was pending, a second private investigator, McNeil Investigations, submitted a report of an interview with Fowlkes. The notes of the investigator's interview with Fowlkes on December 18, 2001, are as follows:

> I met with (Rat Boy) James Fowlkes of 435 Bickley Place, Chester, Pa. We met in the 200 block of Sunnyside, Chester, Pa where he was working on a house. Mr. Fowlkes stated that he and Kevin Kelly were together that night drinking and went on to say that they were at the bar at 12th and Madison and went upstairs to drink some more. He stated that they were together until 2:00 a.m. He also stated that he would got o [sic] court and tell his story. He went on to say that a lady by the name of Connie Lovelace was with them also. I asked him where I could find this Connie, and he stated that she hangs around 3rd and Flower Streets, at the Keystone Bar. I thanked him for his time and left.

(Petr's. Response and Objection to R&R, Ex. 1(B).)

PCRA counsel withdrew, and new counsel was appointed. Appointed counsel for Kelly filed another amended PCRA petition and stated Kelly's claim for ineffectiveness of counsel for failure to investigate and subpoena Fowlkes and others had been previously

6

litigated and lacked merit. Counsel's belief was incorrect; the issue had only been litigated with respect to Carter and Williamina Kelly. The PCRA petition was denied after an evidentiary hearing.

Counsel for Kelly filed an appeal to Superior Court. After receiving counsel's Superior Court brief, Kelly filed a *pro se* petition alleging ineffective assistance of PCRA counsel. PCRA counsel filed a petition for remand.

The Superior Court remanded the action to the Commonwealth PCRA court, ordered new counsel appointed for Kelly, and instructed the parties to file new briefs with the Superior Court. The trial court appointed new PCRA counsel. The counseled brief in Superior Court did not argue trial counsel was ineffective for failing to investigate or call Fowlkes as an alibi witness at trial. The Superior Court affirmed the denial of PCRA relief.

Kelly filed a habeas petition and claimed: (1) trial counsel was ineffective for failing to investigate and call two defense witnesses (presumably Williamina Kelly and Ernest Carter) to rebut the Commonwealth's witnesses; (2) the trial court erred in using facts outside the trial proceedings to enhance Kelly's sentence; (3) trial counsel was ineffective for failing to move to suppress an allegedly improper photo array; (4) trial counsel was ineffective for failing to call James "Ratboy" Faulks [Fowlkes] as an alibi witness; and (5) trial counsel was ineffective for failing to call Williamina Kelly "who would have testified to the involvement of the co-defendants in the incident and exculpated petitioner." (Pet. for Habeas Corpus at 9, 10.)

This habeas petition was referred to Magistrate Judge Peter B. Scuderi for a Report and Recommendation. Magistrate Judge Scuderi recommended that the habeas petition be denied

because claims 1, 3 and 5 lacked merit, and claims 2 and 4 were procedurally defaulted. Kelly objected and contended that he did raise his counsel's ineffectiveness in failing to call James Fowlkes, both on direct appeal and in the PCRA proceedings. Kelly also maintained he is "actually innocent" of the crimes for which he was convicted and that his innocence would have been established by the testimony of alibi witnesses who would have placed him "on the other side of town" at the time the crime occurred. Kelly objected to the Magistrate Judge's findings on all five claims.

This court reviewed Kelly's objections and approved and adopted Magistrate Judge Scuderi's recommendation that claims 1, 3, and 5 lacked merit. The court agreed with the Magistrate Judge that trial counsel was not ineffective for failing to call Ernest Carter as an alibi witness, because Carter refused to accept the trial subpoena. Carter had also described a man similar to Kelly's size and weight in the vicinity of the crime, and described a blue jogging suit similar to the one police found at the home of Kelly's girlfriend. The court also agreed with the Magistrate Judge that trial counsel was not ineffective for failing to call Williamina Kelly as a witness, because most of her testimony was based on hearsay and would not have been particularly helpful.

The court agreed that claims 2 and 4 were procedurally defaulted and Kelly had not shown cause for the default. Because Kelly asserted actual innocence, the court did not approve Magistrate Judge Scuderi's recommendation to deny claims 2 and 4, but ordered counsel appointed and remanded the petition for an evidentiary hearing to determine: (1) the factual basis underlying Claims 2 and 4; and (2) whether Kelly makes a sufficient showing of actual innocence so claims 2 and 4 may be considered on the merits although they are procedurally defaulted.

Magistrate Judge Scuderi held an evidentiary hearing at which Fowlkes testified. Fowlkes testified he knew Kelly because he had a close relationship with Kelly's mother. (Hr'g Tr. 8:13-8:17, July 26, 2007.) He testified that on the night of April 27, 1996, between 6:00 p.m. and 6:30 a.m. the next morning, Fowlkes, Kelly, and Connie Lovelace were drinking in a room above the bar at Madison Grille, where Fowlkes worked. (Hr'g Tr. 9:5-10:16, 11:13-11:14.) Fowlkes fell asleep at 2:00 a.m. on the morning of April 28, 1996. (Hr'g Tr. 26:2-26:3.) According to Fowlkes, Kelly and Connie Lovelace could not have left the room because the door was locked and Fowlkes kept the keys in his pocket and locked to his belt. (Hr'g Tr. 10:13-10:21, 21:21-21:24.) Fowlkes did not let Kelly out of the locked room until 6:30 a.m. on April 28, 1996. (Hr'g Tr. 11:13-11:14.) Testimony by Agent Thomas F. Mincavage revealed it was approximately an eight to ten minute drive from the Madison Grille to the scene of the crime. (Hr'g Tr. 52:7-54:3.) Fowlkes' testimony contradicted Robert Keatley's trial testimony that Kelly arrived at London's apartment at approximately 1:45 a.m. on April 28, 1996.

On cross-examination, counsel for the Attorney General asked Fowlkes if he told an investigator in February 1998 that Kelly left the Madison Grille at 1:45 a.m. on April 28, 1996, and that Fowlkes never saw Kelly again. (Hr'g Tr. 18:14-18:16.) Fowlkes testified he may have given the investigator this information because he was drunk; at the time, he regularly had been drinking heavily. (Hr'g Tr. 18:17-18:19.) Fowlkes stated he had been in rehabilitation since 1998, and after rehabilitation, he "started picturing things back together." (Hr'g Tr. 18:22-18:23, 24:5-24:8.)

Respondents also introduced an investigation report by Sergeant Joseph Patrick O'Berg at the evidentiary hearing before Magistrate Judge Scuderi. Sergeant O'Berg testified he

9

interviewed Kelly during his investigation of the April 28, 1996, shooting. (Hr'g Tr. 40:2-40:24.) According to the investigation report, dated May 8, 1996, Kelly stated he drove with Clifford Harris and his cousin to Delaware to obtain a gallon of Thunderbird at approximately 11:45 on April 27, 1996. (Hr'g Tr., July 26, 2007, Respondents' Ex. B.) He stated he was with the Harrises for approximately half an hour before they bought the wine, and approximately fifteen minutes after they bought the wine. Id.

According to the investigation report, after buying the wine, Kelly drove the Harrises to Clifford Harris's mother's house on 2nd Street so Clifford Harris could "try to get a couple of dollars." Id. Kelly saw Greg Holland standing outside Rico's Bar and talking to his sister Linda on the telephone. Id. Kelly spoke with Linda. Id. Clifford Harris did not receive any money from his mother's house, so Kelly and the Harrises drove to the area of 3rd and Highland Street to drink the wine. Id. After they finished the wine, Kelly dropped off the Harrises. Id. Kelly stated he then went to the Madison Bar,[3] where he saw Derrick Nicholson. Id. Kelly stated he stayed at the Madison Bar for approximately fifteen minutes, then went to his house to go to the bathroom. Id. Kelly stated he was alone in his apartment for approximately half an hour, then he drove towards the West End and down Clover Lane at approximately 3:00 a.m. on April 28, 1996. Id. Kelly stated he then drove toward Westchester to pick up his mother, but his car broke down. Id.

In the Supplemental R&R, Magistrate Judge Scuderi noted the inconsistencies among Fowlkes' statements to the investigators and his testimony at the evidentiary hearing. The Magistrate Judge found reasonable jurors would not have found Fowlkes' alibi testimony credible,

---

[3]The court assumes when Kelly refers to the "Madison Bar" in the investigation report, he actually is referring to the "Madison Grille" where Fowlkes worked.

partly because of Fowlkes' longstanding alcohol problem and the appearance of bias due to Fowlkes' close relationship with Kelly's mother.  Magistrate Judge Scuderi also noted the contradictions between Fowlkes' testimony and Kelly's statements to the police.  Considering the totality of the evidence, Magistrate Judge Scuderi recommended finding Kelly had not met the actual innocence standard, and was not entitled to argue the merits of claims 2 and 4.

Kelly, arguing trial counsel deprived him of a fair trial, filed objections.  Kelly claims a jury must weigh Fowlkes' testimony before Kelly is condemned to life in prison.  Kelly emphasizes that despite his numerous collateral attacks and appeals, Fowlkes was not called to testify for ten years.  He argues it is not appropriate for him to bear the burden of demonstrating actual innocence before the court considers his habeas claims.

## II.    DISCUSSION

A district court reviews *de novo* those portions of a magistrate judge's report and recommendation to which objection is made.  See 28 U.S.C. § 636(b)(1)(C).

Claims 2 and 4 of Kelly's habeas petition are procedurally defaulted.  In the memorandum and order dated October 6, 2006, this court determined that Kelly did not establish "cause and prejudice" to excuse the procedural default, so Kelly must establish a "fundamental miscarriage of justice," i.e. actual innocence, in order to proceed with his habeas claims.  See Schlup v. Delo, 513 U.S. 298, 314-15, 321 (1995).  A claim of innocence is a gateway through which a habeas petitioner must pass to have an otherwise barred constitutional claim considered on the merits.  Id. at 315.

A petitioner asserting a claim of actual innocence must "support his allegations of

11

constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Id. at 324. The petitioner must show a constitutional violation "has probably resulted in the conviction of one who is actually innocent." Id. at 327; Murray v. Carrier, 477 U.S. 478, 496 (1986). To satisfy the gateway standard for actual innocence, a petitioner must show that in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327. In other words, the petitioner must show, in light of the new evidence, it is "more likely than not any reasonable juror would have reasonable doubt." House v. Bell, 547 U.S. 518, 538 (2006). The district court must make a probabilistic determination about what reasonable, properly instructed jurors would do. Schlup, 513 U.S. at 329. The court's function is not to make an independent factual determination about what likely occurred, but to assess the likely impact of the evidence on reasonable jurors. House, 547 U.S. at 538.

In assessing a claim of actual innocence, the district court is not bound by the rules of admissibility that would govern at trial. Schlup, 513 U.S. at 327. The habeas court must make its determination in light of all the evidence, and must consider evidence claimed to have been wrongly excluded or unavailable at trial. Id. at 327-28. The court must assess how reasonable jurors would react to the overall newly supplemented record. House, 548 U.S. at 538.

Despite Kelly's objection that it is unfair for him to assume the burden of demonstrating actual innocence, the court must apply the Schlup standard in determining whether Kelly can proceed with his procedurally defaulted claims. In light of all the evidence in the record, Kelly has not met the Schlup standard of actual innocence by showing that no reasonable juror would

have found him guilty beyond a reasonable doubt even if Fowlkes had testified. Robert Keatley testified at trial that Kelly fired the shots which killed London and wounded Keatley. Clifford Harris and Tyrone Harris testified that Kelly and Tyrone Harris passed a revolver between them and discussed robbing London. They also identified Kelly as the shooter. The only evidence presented in Kelly's defense at trial consisted of a detective's testimony that Keatley failed to identify Kelly in a Delaware County Prison lineup as the shooter.

Evidence added to the record after Kelly's trial consists of statements from Ernest Carter, Williamina Kelly, and James Fowlkes. Carter's testimony tended to corroborate the Commonwealth's case, as he had reported observing a black male wearing a dark jogging suit, similar to the one found in the home of Kelly's girlfriend, at the scene of the crime. Inconsistency between Carter's description of the person driving the Dodge Neon automobile on the night of the shooting, and the Harrises' testimony that Kelly was the driver, would not be likely to create a reasonable doubt regarding Kelly's guilt in the mind of a reasonable juror. Williamina Kelly's testimony that Tyrone Harris gave his mother the murder weapon, with instructions to dispose of it, is not particularly credible because it was not based on firsthand observation but on hearsay.

Fowlkes testified at the evidentiary hearing before Magistrate Judge Scuderi that Kelly was locked in Fowlkes' room above the Madison Grille from 6:00 p.m. on April 27, 1996, to 6:30 a.m. on April 28, 1996. This testimony is inconsistent with his statement to the McNeil investigator that Fowlkes was with Kelly until 2:00 a.m. on April 28, 1996, and his statement to the Lennon investigator that Kelly was at the Madison Grille until 12:30 a.m. or 1:00 a.m., and returned to and departed from the Madison Grille sometime between 1:30 a.m. and 1:45 a.m.. Kelly's statement to Sergeant O'Berg fails to corroborate Fowlkes' testimony, as Kelly did not

mention Fowlkes, and stated he was in the Madison Grille for only fifteen minutes.

Moreover, a reasonable juror is not likely to find Fowlkes credible because of his close relationship with Kelly's mother and his alcohol problems at the time Fowlkes gave his statements to the investigators. Although Fowlkes testified his alcohol problems have been resolved since he began rehabilitation, his most recent testimony before Magistrate Judge Scuderi in July, 2007, is not credible because of the passage of time since the shooting in April, 1996.

Considering the testimony from Keatley and the Harrises identifying Kelly as the shooter, and testimony from Carter describing a man similar to Kelly at the scene of the crime, it is not more likely than not that any reasonable juror would have a reasonable doubt regarding Kelly's guilt because of evidence from Fowlkes, Carter, and Williamina Kelly. In light of the entire record, it is more likely than not that a reasonable juror would have found Kelly guilty beyond a reasonable doubt. Kelly has failed to satisfy the gateway standard of actual innocence under Schlup. He is not entitled to argue the merits of his procedurally defaulted claims.

### III. CONCLUSION

Magistrate Judge Scuderi's Supplemental R&R will be approved and adopted. Kelly's objections will be overruled. Kelly's petition for writ of habeas corpus under 28 U.S.C. § 2254 will be denied. There is no basis for the issuance of a certificate of appealability.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEVIN LAMONT KELLY** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **EDWARD J. KLEM, THE DISTRICT ATTORNEY OF THE COUNTY OF DELAWARE, and THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA** | : : : : : : | **NO. 05-3843** |

## ORDER

**AND NOW**, this 21st day of August, 2008, upon consideration of Magistrate Judge Scuderi's Supplemental Report and Recommendation, petitioner's objections, and all other relevant papers, for the reasons included in the accompanying memorandum, it is **ORDERED**:

1. The Supplemental Report and Recommendation (paper no. 49) is **APPROVED and ADOPTED**.

2. Petitioner's objections to the Supplemental Report and Recommendation (paper no. 56) are **OVERRULED**.

3. The petition for a writ of habeas corpus (paper no. 1) under 28 U.S.C. § 2254 is **DENIED**.

4. There is no probable cause for the issuance of a certificate of appealability.

                                          /s/ Norma L. Shapiro
                                                                             S.J.